AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

2020 JAN -3  AM 9: 31

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIST. DAYTON

| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. 3: 20 mj 0006 |
| INFORMATION ASSOCIATED WITH (937) 219-6385 THAT IS STORED AT PREMISES CONROLLED BY SPRINT CORPORATION | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

### SEE ATTACHMENT A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

### SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 21 USC 841 | Distribution of a controlled substance. |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA P. Andrew Gragan, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __01/03/2020__

_____
*Judge's signature*

City and state: Dayton, Ohio

Sharon L. Ovington, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR SOUTHER DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH (937) 219-6385 THAT IS STORED AT PREMISES CONROLLED BY SPRINT CORPORATION | Case No. **3.20 mj006** |
| | **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, P. Andrew Gragan, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with Boost Mobile phone number **(937) 219-6385** (the "**ACCOUNT**") that is stored at premises owned, maintained, controlled, or operated by Sprint Corporation, a wireless provider headquartered at 6480 Sprint Parkway, Overland Park, Kansas 66251. The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Sprint Corporation to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), Cincinnati Division. I have been employed as a Special Agent with the FBI since May 2016.  I have received training in national-security investigations and criminal investigations. I have specifically conducted investigations related to international terrorism, white-collar crimes, drug trafficking, public corruption, firearms, and violent crimes.  As part of these investigations, I

have participated in physical surveillance and records analysis, worked with informants,

conducted interviews, served court orders and subpoenas, and executed search and arrest

warrants.

      3.     Based on my aforementioned training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and as a result, know the following:

      a.     It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and cellular services by using aliases or other person's names in order to avoid detection by law enforcement officials

      b.     It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution.

      c.     It is common practice for drug traffickers to use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

      d.     It is common practice for drug traffickers to often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

      e.     It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

      f.     It is common practice for drug traffickers to possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

      g.     It is common practice for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are commonly kept where the drug traffickers have ready access to them.

      h.     It is common for drug traffickers to provide false information to law enforcement officials regarding their true identity and the address of their actual residence.

      i.     It is common for persons involved in drug trafficking to conceal in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug

transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

j.      When drug traffickers amass large proceeds from the sale of drugs, they commonly attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

k.      Drug traffickers commonly travel to facilitate their drug trafficking activities. After purchasing drugs, drug traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

l.      It is common practice for drug traffickers to commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information is commonly stored in cellular phones in places such as the contacts list.

m.      Drug traffickers frequently have been known to take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones.

n.      Drug traffickers have commonly been known to have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types.  Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

o.      Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking contraband and other incriminating evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

p.      It is uncommon for drug traffickers to openly discuss the exact quantities, prices, dates, and methods of delivery of drugs are in detailed terms over the telephone.  These details are usually agreed upon during face-to-face transactions.  For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations.  Drug traffickers commonly make extensive use of cellular phones and text messaging

3

beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

q.    Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

r.    Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

s.    I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a so-called "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.

4.    The facts in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841 (Distribution of a controlled

4

substance) have been committed by **Charles Edward Harper** ("**HARPER**"). As such, there is also probable cause to search the information and evidence described in Attachment A, seize items described in Attachment B.

## JURISDICTION

1.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

2.      On or about August 6, 2019, the FBI, assisted the Dayton Police Department in the investigation of a mass shooting that occurred in "the Oregon District" of the city, on or about August 4, 2019. A search warrant issued by the Dayton Municipal Court was served on Facebook, Inc., for an account associated with a Connor Betts, the identified shooter, hereinafter referred to as "Betts," Instagram account "trapaholicb."

3.      On or about August 7, 2019, Facebook provided law enforcement officials certain records in response to the said search warrant for Instagram account "trapaholicb." A subsequent review of the said account by the FBI revealed the following direct messages between Betts and Instagram account mhn_chuck.

> 7/15/2019 – **trapaholicb** – *Ayy whatre y' all s prices for kpins and soft white*
>
> 7/15/2019 – **mhn_chuck** – *Don' t kno bout k pins but I' m finna check up on the way soda*
>
> 7/15/2019 – **trapaholicb** – *Ight*
>
> 7/19/2019 – **trapaholicb** – *Ayy any word bout them pins?*

5

7/21/2019 – **mhn_chuck** – *Bro don' t got the klonos g but he got perks and like a off brand xan. I took one of them bitches lastnight and it put me on my ass*

7/21/2019 – **trapaholicb** – *Ight. Lemme get 2 of them*

7/21/2019 – **mhn_chuck** – *Ight g I' m finna text em and c how much he lettin em go for*

7/21/2019 – **trapaholicb** – *Iiiight thx b*

4.      Based on my training and experience, I know that "kpins," "pins," or "klonos" are street terms referencing Klonopin. I also know that "xan" is a *street term* referencing Xanax. Klonopin and Xanax are both benzodiazepines, which are Schedule IV controlled substances. I also know that "perks" is a street term referencing Percocet. Percocet is oxycodone, which is a Schedule II controlled substance. I also know that "soft white" is a street term referencing cocaine, which is a Schedule II controlled substance.

5.      Following the August 4, 2019 shooting incident, Betts' corpse was transported to the Montgomery County Coroner for autopsy. During the autopsy, Dayton Police Officers removed personal effects from the pockets of Betts' person, including an approximate three inch long black straw with a baggie attached to the end of it by a rubber band. Inside this baggie was found a white powder, which the seizing officers, based on their training and experience, suspected to be cocaine. The suspected cocaine was subsequently submitted to the Miami Valley Regional Crime Lab (MVRCL) for forensic testing. On or about August 9, 2019, the MVRCL confirmed that the said white powdery substance was in fact cocaine.

6.      On or about August 4, 2019, the FBI interviewed a personal friend of Betts, who accompanied him to the scene of the shooting, and was subsequently shot and wounded by him. For the purpose of this affidavit this individual will be referred to as "C.B."  C.B. advised law

6

enforcement officials that around July 26-28, 2019, Betts indicated to C.B. that he had relapsed with cocaine and it was not interacting well.

7.       On or about August 4-7, 2019, the FBI interviewed multiple individuals associated with Betts. One of these individuals was a high school girlfriend of Betts, who for the purpose of this affidavit will be referred to as "H.S." H.S. advised law enforcement officials that Betts had previously abused a variety of drugs, including Adderall, Xanax, cocaine, and marijuana. A co-worker of Betts, who for the purpose of this affidavit will be referred to as "N.G.," advised law enforcement officials he was aware Betts previously had a methamphetamine addiction approximately three years ago. A co-worker of Betts, who for the purpose of this affidavit will be referred to as "K.G.," advised law enforcement officials that Betts had told K.G. that he used to have a drug abuse problem during high school. When K.G. inquired what type of drugs Betts was abusing, Betts mentioned huffing and cocaine. A bandmate of Betts, who for the purpose of this affidavit will be referred to as "J.C.," advised law enforcement officials that Betts had told J.C. he used to use methamphetamine. A co-worker of Betts, who for the purpose of this affidavit will be referred to as "C.W.," advised law enforcement officials that Betts had used methamphetamine in the past. C.W. believed Betts had been "clean" for approximately four years. A co-worker of Betts, who for the purpose of this affidavit will be referred to as "A.G.," advised law enforcement officials that he/she believed that Betts had a history of drug abuse. An acquaintance of Betts, who for the purpose of this affidavit will be referred to as "J.E," indicated to law enforcement officials that he/she and Betts hung out at least once a month from 2014 through 2017. J.E. further indicated that Betts was hardly ever observed to be in a sober state during this time period, and was known to have used heroin,

cocaine, methamphetamine, and prescription narcotics. J.E. further advised that Betts would often show up to his/her home "messed up."

8.　　On or about August 7, 2019, the FBI interviewed a former co-worker of Betts, who for the purpose of this affidavit will be referred to as "E.S." E.S. advised law enforcement officials that on or about August 2, 2019, at approximately 4:45p.m., Betts came into his/her place of employment and bought a beer. Before leaving, Betts made the comment, "I just popped a xanny, we'll see how it goes." Based on my training and experience, I know that the term "xanny" is a common street term referencing Xanax.

9.　　On or about August 7-8, 2019, the FBI interviewed multiple individuals associated with Betts. An acquaintance of Betts, who for the purpose of this affidavit will be referred to as "J.E." J.E. advised law enforcement officials he/she believed Betts was using various drugs, including cocaine, methamphetamine, heroin, and molly. A friend of Betts, who for the purpose of this affidavit will be referred to as "E.K.," informed law enforcement officials that he/she and Betts had done "hard drugs," marijuana, and acid together four to five times a week during 2014 to 2015.

10.　　On or about August 15, 2019, the Montgomery County Coroner's Office completed the toxicology report for Betts. The results of the report confirmed that Betts had alprazolam, cocaine, and ethanol in his system. Alprazolam is a benzodiazepine, of which Xanax is a brand name. Based on this report, Dayton Police Department subsequently revealed to the public that Betts had cocaine, Xanax, and alcohol in his system at the time of his death.

11.　　The FBI, pursuant to a search warrant issued by the Dayton Municipal Court, examined stored data contained on Betts' cell phone, (***) ***-3637. In the "contacts section" was a phone number listed as **(937) 219-6385** (hereinafter the "**ACCOUNT**") and labeled

8

"Chuck Chipotle." A subsequent review of the **ACCOUNT** by the FBI revealed the following text messages between Betts' phone number and the **ACCOUNT**:

7/25/2019 10:19am – **(\*\*\*) \*\*\*-3637** – *Suh he do soft white too? Or just bars and bud*

7/25/2019 1:42pm – **(937) 219-6385** – *Jus the bars and bud g*

7/25/2019 1:52pm – **(\*\*\*) \*\*\*-3637** – *Ight. When you work tomorrow*

7/25/2019 1:52pm – **(937) 219-6385** – *I go on break at 330*

7/25/2019 1:55pm – **(\*\*\*) \*\*\*-3637** – *You gonna have em by then.*

7/25/2019 1:55pm – **(\*\*\*) \*\*\*-3637** - *?*

7/25/2019 11:29pm – **(\*\*\*) \*\*\*-3637** – *Ayy everyone's fallen through. Adderall, Ritalin, concerta, or vyvanze?*

7/26/2019  5:45am – **(937) 219-6385** – *Wym g*

7/26/2019 9:11am – **(\*\*\*) \*\*\*-3637** – *I need some of those if anyone has any lol*

7/26/2019 9:25am – **(937) 219-6385** – *Imma c if he got any of those in*

7/26/2019 9:54am – **(937) 219-6385** – *I got the shits bro. Meet me at the job at 3:30*

7/26/2019 10:15am – **(\*\*\*) \*\*\*-3637** – *Lmao iiiight heard*

7/26/2019 3:09pm – **(\*\*\*) \*\*\*-3637** – *Ight I'm here lmao took sister to lunch*

7/26/2019 3:21pm – **(937) 219-6385** – *I'm out back*

7/26/2019 3:21pm – **(\*\*\*) \*\*\*-3637** - *Ight*

12.     Based on my training and experience, I know that "bars" is a street terms referencing Xanax. I also know that "bud" is a street term referencing marijuana, a Schedule I controlled substance. Adderall is an amphetamine, which is a Schedule II controlled substance. Ritalin and Concerta are methylphenidates, which are Schedule II controlled substances. Vyvanse is a lisdexamfetamine, which is a Schedule II controlled substance.

9

13. On or about November 5, 2019, Sprint provided to law enforcement authorities certain records in response to a federal grand jury subpoena seeking information concerning said phone number. The subscriber was listed as Charles Ajrper with address of 718 Gruner Avenue, Dayton, Ohio.

14. A review of Ohio Bureau of Motor Vehicle (BMV) records indicate that **HARPER** resides at 718 Gruner Avenue, Dayton, Ohio.

15. A review of publically available information associated with the mhn_chuck account revealed the below profile picture, which appears to be **HARPER** based on a comparison with a known BMV photograph maintained on **HARPER.**



16. On or about November 14, 2019, Facebook provided records to law enforcement authorities in response to a federal grand jury subpoena seeking information concerning the mhn_chuck Instagram account. The information included subscriber information, including registered email address charlesharper546@gmail.com and phone number **(937) 219-6385**.

17.     In my training and experience, I have learned that Sprint Corporation is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for Sprint Corporation subscribers may be located on the computers of Sprint Corporation Further, I am aware that computers located at Sprint Corporation contain information and other stored electronic communications belonging to unrelated third parties.

18.     Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may remain in the system of Sprint Corporation for weeks or months.

19.     Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers.  This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Sprint Corporation for short periods incident to and following their transmission.  In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

20.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems.  This

11

information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

21.     Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

22.     Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio

signal from the cellular device and thereby transmitted or received the communication in question.

23.    Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

24.    In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

25.    As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and

13

prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time. Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cellular device owner. Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

14

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

26.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Sprint Corporation to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

27.     Based on the forgoing, I request that the Court issue the proposed search warrant.

28.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

29.     The government will execute this warrant by serving the warrant on Sprint Corporation.  Because the warrant will be served on Sprint Corporation, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

30.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of

the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

P. Andrew Gragan
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____Jan 3_____, 2020

SHARON L. OVINGTON
UNITED STATES MAGISTRATE JUDGE

16

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Boost Mobile phone number **(937) 219-6385** that is stored at premises owned, maintained, controlled, or operated by Sprint Corporation, a wireless provider headquartered at 6480 Sprint Parkway, Overland Park, Kansas 66251.

## ATTACHMENT B

### Particular Things to be Seized

#### I.  Information to be disclosed by Sprint Corporation

To the extent that the information described in Attachment A is within the possession, custody, or control of Sprint Corporation , regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or information that have been deleted but are still available to Sprint Corporation or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Sprint Corporation is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      All voice mail, text, and multimedia messages **January 1, 2019 to Present,** stored and presently contained in, or on behalf of the account or identifier;

b.      All existing printouts from original storage of all of the text messages described above;

c.      All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from **January 1, 2019 to Present;**

d.     All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message **January 1, 2019 to Present;**

e.     All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

f.     Detailed billing records, showing all billable calls including outgoing digits, from **January 1, 2019 to Present;**

g.     All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number), from **January 1, 2019 to Present;**

h.     Incoming and outgoing telephone numbers, from **January 1, 2019 to Present;**

i.     All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

j.     All records pertaining to communications between **January 1, 2019 to Present,** and any person regarding the account or identifier, including contacts with support services and records of actions taken.

2

The Provider is hereby ordered to disclose the above information to the government within fourteen days of issuance of this warrant.

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. § 841 (Distribution of a controlled substance) have been committed by Charles Edward Harper since January 1, 2019 including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.        Evidence indicating the sale, possession, distribution, or production of illegal drugs;

b.        Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crime under investigation;

c.        Evidence indicating the geographic location of the cellular device at times relevant to the investigation;

d.        Evidence indicating the cellular device owner or user's state of mind as it relates to the crime under investigation;

e.        The identity of the person(s) who created the account associated with the cellular device and/or used the cellular device, including records that help reveal the whereabouts of such person(s).

f.        The identity of the person(s) who sent to and/or received communications from the cellular device about matters relating to the sale, possession, distribution, or production of illegal drugs, including records that help reveal their whereabouts.

3

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.]]

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Sprint Corporation and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Sprint Corporation.  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.  all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Sprint Corporation, and they were made by Sprint Corporation as a regular practice; and

b.  such records were generated by Sprint Corporation electronic process or system that produces an accurate result, to wit:

1.  the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Sprint Corporation in a manner to ensure that they are true duplicates of the original records; and

5

2. the process or system is regularly verified by Sprint Corporation, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____

Date

_____

Signature

6